JESSICA ATKINS, individually and as
mother and next friend of JANE DOE, a
minor,

        Plaintiffs,

    v.

NIZAR HASAN, et al.,

        Defendants.

No. 15 CV 203

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

In the early morning of March 26, 2014, Jessica Atkins was asleep in her bed, her young daughter by her side, when approximately 25 law-enforcement officers entered the house and detained the mother and child at gunpoint. The officers were executing a search warrant connected with an incident involving Atkins's husband, but the officers ultimately handcuffed and arrested Atkins. Atkins was held in police custody for over 12 hours, during which time she was not permitted to have any contact with her family. In January 2015, Atkins and her minor daughter, Jane Doe, sued six police officers (three Illinois State Troopers and three village police officers) for violations of their constitutional and common-law rights. Nine more officers (eight state troopers and one village police officer) were later added as defendants to an amended complaint.

The state-trooper defendants moved to dismiss the amended complaint under Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons discussed below, defendants' motion is granted in part and denied in part.

## I.    Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint need not include specific facts, but it must provide the defendant with fair notice of what the claim is, and the grounds upon which it rests. *Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1098–99 (7th Cir. 2015) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The complaint must present enough factual matter, accepted as true, that the claim to relief "is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In considering a motion to dismiss under Rule 12(b)(6), the district court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013) (quoting *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010)). The same is required when considering a motion to dismiss under Rule 12(b)(1). *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 539 (7th Cir. 2012) (citing *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012)).

## II.     Facts

Around 5:30 in the morning on March 26, 2014, Jessica Atkins was asleep in her home in South Elgin, Illinois when approximately 25 law-enforcement officers in tactical gear broke down the doors to her house. *See* [28] ¶¶ 20, 22.[1] The officers were executing a search warrant, issued the previous day by a state-court judge in DuPage County, concerning an incident involving Atkins's husband that had taken place a few days before. *See id.* ¶¶ 1, 22, 24.    The warrant authorized a search of Atkins's residence for evidence of several crimes under Illinois law—aggravated assault, 720 ILCS 5/12-2(c)(3); aggravated discharge of a firearm, *id.* at 5/24-1.2(a)(2); and reckless discharge of a firearm, *id.* at 5/24-1.5(a)—including firearms, ammunition, spent ammunition casings, and any "indicia related to ownership and/or possession of firearms." Search Warrant No. 14011, Circuit Court of the Eighteenth Judicial Circuit, State of Illinois, [33-1] at 2.[2]

According to Atkins, the officers did not knock or announce their presence, but instead "exploded" and broke down the doors to her house without warning. [28] ¶¶ 25, 26. The officers then made their way to the second floor of the residence, where Atkins and her minor daughter, Jane Doe, were asleep together in bed. *See*

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets; referenced page numbers are from the CM/ECF header placed at the top of filings. The facts related in this opinion are taken from plaintiffs' amended complaint and a search warrant obtained by the officers (*see* note 2).

[2] The warrant is a court record of which this court may take judicial notice. *See Miller v. City of Monona*, 784 F.3d 1113, 1117 (7th Cir. 2015) ("[W]e may take judicial notice of court records.") (citation omitted); *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009). The court may review information subject to proper judicial notice in considering defendants' motion to dismiss. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012) (citation omitted).

*id.* ¶ 25. (Atkins's other minor child was sleeping over at a neighbor's house. *See id.*) It is unclear from the complaint whether Atkins's husband was in the house at the time, though he did live there. *See id.* ¶ 20. The officers entered the bedroom, jumped on the bed, and pointed their guns at Atkins and her daughter. *See id.* ¶ 25. The officers then removed the mother and daughter from the bed and detained them for an unspecified period of time, ultimately placing Atkins in handcuffs and under arrest. *See id.* ¶¶ 27, 39.

After taking Atkins into custody, the officers transported her to the South Elgin Police Department (and later to the DuPage County Jail), where—at one law-enforcement facility or the other (it is unclear which)—Atkins was made to change into prison clothes and stand in a line-up. *See id.* ¶¶ 29, 62. She was released from police custody over 12 hours later. *See id.* ¶ 29. During her detention, Atkins claims that she was refused food, access to an attorney (despite her request to speak to one), and access to any of her family members, including her children. *See id.* She was not charged. *See id.* ¶ 30.

In January 2015, Atkins and her daughter sued three Illinois State Troopers and three South Elgin police officers for violations of their constitutional rights and rights under state common law. *See generally* [1]. Plaintiffs later filed an amended complaint, [28], in which they added as defendants eight more state troopers and one more South Elgin police officer, *see id.* ¶¶ 7–14, 18. The amended complaint included eight counts against the officer defendants: plaintiffs' claim of excessive force under 42 U.S.C. § 1983 (Count I); plaintiffs' state-law claims of assault

(Counts IV, V) and intentional infliction of emotional distress (Counts VI, VII); Atkins's claims of false arrest (Count II) and substantive due-process violations (Count III) under Section 1983; and Atkins's claim of false imprisonment under state law (Count VIII). *See id.* at 10–27. The plaintiffs also asserted a claim for indemnity by the Village of South Elgin pursuant to Illinois statutory law (Count IX). *See id.* at 27.

The state-trooper defendants filed a motion to dismiss the claims against them on the grounds that: (1) plaintiffs' use of "group pleading" fails to satisfy the notice-pleading requirements set forth in Rule 8 of the Federal Rules of Civil Procedure; (2) the state defendants are in any event qualifiedly immune from suit on the excessive-force and due-process claims (Counts I and III, respectively); (3) sovereign immunity bars the state-law claims (Counts IV, VI, and VIII); and (4) even if sovereign immunity does not apply, plaintiffs have failed to state a proper cause of action for assault or intentional infliction of emotional distress. [33].

## III.    Analysis

### A.      Group Pleading (All Claims)

The state defendants first take issue with plaintiffs' "group pleading" approach. Rather than explaining "who did what," say defendants, plaintiffs merely refer to "the defendants," collectively—which does not provide to each defendant sufficient notice of what he or she purportedly did wrong. *See* [33] at 4–6 (discussing *Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013)). Details about who did what are not merely nice-to-have features of an otherwise-valid complaint;

to pass muster under Rule 8 of the Federal Rules of Civil Procedure, a claim to relief *must* include such particulars. *See Knight*, 725 F.3d at 818 (explaining that notice-pleading standards require complaints "based on a theory of collective responsibility [to] be dismissed").

Unlike in *Knight*, where the plaintiff alleged without any further elaboration merely that "the defendants looted the corporation," *id.*, the complaint here is fairly specific as to the what the police officers supposedly did. Plaintiffs describe in their complaint not only when and how the officers allegedly entered plaintiffs' home on March 26, 2014 (by "exploding" and breaking down doors at 5:30 in the morning), but also what actions the officers purportedly took after gaining entry—including, for instance, how the officers entered plaintiffs' bedroom, jumped on their bed, detained them at gunpoint, and placed Jessica Atkins under arrest. *See* [28] ¶¶ 22, 25, 27, 39. What plaintiffs neglect to explain, however, is precisely *who* of the named defendants did which of these things. This is a problem because, as defendants rightly point out, liability is personal. *Knight*, 725 F.3d at 818 (noting that "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful").

It is true that, in certain cases, referring simply to "the defendants" without further specification may adequately plead personal involvement. *See Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009) (noting that such collective pleading is permissible where it is clear that the plaintiff is directing their allegations "at all of the defendants"). But plaintiffs' complaint here is insufficient even in this respect

because, in many instances, plaintiffs allege not that "the defendants" (*i.e.*, *all* of the defendants) performed certain actions, but that these actions were performed by "the [d]efendants, *or other individuals acting at the direction of, agreement with and/or with the actual knowledge of the [d]efendants.*" [28] ¶ 25 (emphasis added); *see also id.* ¶¶ 27–30, 33, 35, 39, 41, 35, 47 (employing the same language). This kind of pleading is indeed inadequate, because it provides no clues as to whether, for the particular conduct described, plaintiffs assert that each and every one of the defendants engaged in that conduct—in which case the collective descriptor may be permissible—or whether plaintiffs instead contend that only some of the defendants, or possibly even *none* of them, performed a given act. *Cf. Brooks*, 578 F.3d at 580 (observing that where a complaint alleges only that "one or more of the Defendants" has engaged in certain conduct, such vague phrasing "does not adequately connect specific defendants to illegal acts").

A defendant may be liable under Section 1983 only if he or she participated directly in a constitutional violation. *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). For supervisors, the direct-participation requirement is satisfied where the plaintiff shows that the unconstitutional conduct occurred at the supervisor's direction or with his knowledge and consent. *See id.* (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). The ambiguous phrasing discussed above fails to notify each of the individual state-trooper defendants of which (if any) of the actions described in the complaint they are alleged to have participated in directly. Nor does this vague phraseology alert each

of the individual state-trooper defendants to which (if any) of those actions are alleged to have taken place at that officer's direction, or with their knowledge and consent. Thus, to the extent plaintiffs seek to impose on any of the state-trooper defendants direct (*i.e.*, individual) or supervisory liability under Section 1983, the claims are inadequately pleaded under Rule 8 of the Federal Rules of Civil Procedure.[3] Defendants' motion to dismiss Counts I (excessive force), II (false arrest), and III (due-process violation)—insofar as those claims seek to impose direct or supervisory liability on the state-trooper defendants—is therefore granted.

For similar reasons, defendants' motion to dismiss the state-law claims of intentional infliction of emotional distress (Count VI) and false imprisonment (Count VIII) is also granted insofar as those claims seek to impose direct liability on the trooper defendants. Not only have plaintiffs incorporated into these claims the same ambiguous allegations just discussed, *see* [28] ¶¶ 59, 69, but the additional allegations supporting these claims also fail to provide needed clarification. In describing the conduct that plaintiffs say establishes a claim for intentional infliction of emotional distress, for example, the complaint states that "the Defendants *and/or other named or as-yet unidentified co-conspirators*" performed those particular acts. *Id.* ¶ 62 (emphasis added). The same language is also used to identify who of the defendants performed the acts that plaintiffs say constitute false imprisonment of Jessica Atkins. *See id.* ¶ 73. These assertions are not enough to

---

[3] The "supervisory liability" referenced here is different from *respondeat superior* liability, which cannot form the basis of a claim under Section 1983. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Maniscalco v. Simon*, 712 F.3d 1139, 1145–46 (7th Cir. 2013)); *see also Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009) ("Section 1983 does not establish a system of vicarious responsibility.") (citation omitted).

state a claim for direct or individual liability against the state troopers, since plaintiffs have not alleged that any of those officers actually engaged in any of the conduct described.

Which leaves the conspiracy claims. To prevail on a conspiracy claim under Section 1983, a plaintiff must prove: (1) that two or more individuals reached an agreement to deprive the plaintiff of her constitutional rights; and (2) that there were overt acts in furtherance of this agreement that actually deprived the plaintiff of those rights. *See, e.g.*, *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988)). Illinois employs a similar construct for civil-conspiracy claims brought under state law. *See In re Repository Techs., Inc.*, 601 F.3d 710, 726 (7th Cir. 2010) (explaining that, under Illinois law, a civil conspiracy consists of: (1) an agreement to accomplish an unlawful purpose; and (2) an overt act in furtherance of the conspiracy that is either "tortious or unlawful in character" (quoting *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 645 N.E.2d 888, 894 (1994))). Every member of a conspiracy may be held liable for the acts of others within the scope of the agreement. *See Knight*, 725 F.3d at 818; *see also Pepper v. Vill. of Oak Park*, 430 F.3d 805, 809–10 (7th Cir. 2005) (citing *Hostrop v. Bd. of Jr. College Dist. No. 515*, 523 F.3d 569, 576 (7th Cir. 1975)). But, to adequately plead conspiracy liability under Rule 8, the plaintiff must allege that "a particular defendant joined the conspiracy and knew of its scope." *Knight*, 725 F.3d at 818.

To identify those who allegedly participated in the conspiracy, plaintiffs again use the collective "the Defendants" descriptor. *See, e.g.*, [28] ¶¶ 34, 40, 46, 51, 61, 71. Here, though, it is clear enough from the complaint that—insofar as the conspiracy claims are concerned—plaintiffs are directing the claims at *all* of the named defendants (*i.e.*, to all of the named defendants relevant to a given claim). In Count IV, for example—the assault claim asserted against only the state-trooper defendants (assault against the village defendants is alleged separately in Count V, *see id.* at 19)—plaintiffs follow "the Defendants" descriptor with a list of individual names, including all eleven state-trooper defendants, *see id.* ¶ 51; *see also id.* ¶ 61 (listing the same individuals in Count VI, the emotional-distress claim against the troopers). Thus, it may reasonably be assumed that, for the counts asserted against both the village and state-trooper defendants, the term "the Defendants" means just that: the defendants—all of them.

Plaintiffs in general "may not rely on vague references to a group of defendants." *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013) (quoting *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (internal brackets and quotation marks omitted). But in this instance, it is at least plausible that all of the named defendants entered into an agreement to violate the plaintiffs' rights. The complaint reasonably suggests that *all* of the defendant officers were working together—both on and shortly before March 26, 2014—to investigate the incident involving Atkins's husband. Assuming this is true, it is at least plausible that, if there was indeed an agreement to violate the plaintiffs' rights in some way, all of the officers named in

the complaint entered into that agreement. Thus, if the complaint also describes with sufficient particularity the *scope* of this agreement, then the plaintiffs have given the defendants adequate notice of the conspiracy claims asserted against them.

Plaintiffs' complaint meets this second requirement, too. While the complaint at first describes the alleged agreement in rather vague terms, *see* [28] ¶¶ 34, 40, 46 (stating that the defendants agreed to "use unlawful excessive and unreasonable force during the execution of the search warrant"; to "unlawfully detain and arrest . . . Jessica Atkins"; and to "intentionally and . . . unlawfully interfere with . . . Jessica Atkins['] care, custody, and/or control of her minor children"), it later articulates with specificity the alleged purpose of the conspiracy: to break down Atkins's will and thus "coerce" her into cooperating with the police investigation of her husband's allegedly criminal activities. *See id.* ¶ 61. Allegations describing the particular conduct that plaintiffs say formed the overt acts in furtherance of the supposed agreement also help to further define the contours of that agreement. *See id.* ¶¶ 35, 41, 47, 51–52, 61–62, 71–72. When read "sensibly and as a whole," *Engel*, 710 F.3d at 710, these statements adequately notify the defendants of the purpose and scope of the agreement into which they purportedly entered.

It may be improbable that all fifteen individual defendants—and thus all eleven state-trooper defendants—agreed to coerce Jessica Atkins into cooperating with them by storming into her house with weapons drawn, arresting her without

cause, and detaining her for over 12 hours. But notice-pleading standards do not require probability. *See Iqbal*, 556 U.S. at 678. All that is required at this stage is plausibility, *see id.*, and, for the reasons discussed above, that standard has been met as to plaintiffs' conspiracy claims. Defendants' motion to dismiss those claims based on "group pleading" is therefore denied.

### B.  Qualified Immunity (Federal Claims)

The state-trooper defendants also move to dismiss Counts I (excessive force) and III (substantive due process) based on qualified immunity. *See* [33] at 6–11. Insofar as these claims allege direct or individual liability, they have been dismissed. Plaintiffs' conspiracy claims remain pending, however, so I address qualified immunity as applied to them.

Qualified immunity protects government officials from liability under Section 1983 "for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000)). A plaintiff may show that a particular right was clearly established by pointing to precedent in a closely analogous case, or by showing that the violation "was so obvious that a reasonable person would have known of [its] unconstitutionality." *Brokaw*, 235 F.3d at 1022 (citation omitted).

To determine whether qualified immunity applies to the conspiracy claims in Count I and III of plaintiffs' amended complaint, it must first be determined

whether those who allegedly performed the acts in furtherance of the conspiracy are themselves shielded from liability for those acts. If so, then there can be no conspiracy liability. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 305 (7th Cir. 2011) ("[T]he absence of any underlying violation . . . precludes the possibility of . . . succeeding on a conspiracy claim." (citing *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir. 1999))); *cf. House v. Belford*, 956 F.2d 711, 720 (7th Cir. 1992) ("A person may not be prosecuted for conspiring to commit an act that he may perform with impunity."). Thus, although the direct-liability claims against the trooper defendants have been dismissed, whether the officers could in fact be held liable for those alleged violations is still relevant to the present analysis.

### 1.   *Excessive Force (Count I)*

Plaintiffs claim that the officers used excessive force by: (1) "exploding" or breaking down the doors to plaintiffs' house without first knocking and announcing the officers' presence; and (2) after gaining entry, by charging into plaintiffs' bedroom with automatic or semi-automatic weapons, jumping on plaintiffs' bed while brandishing those weapons, and holding plaintiffs at gunpoint. *See* [28] ¶¶ 25, 33; [40] at 7–8.

The so-called knock-and-announce rule "is a factor to be considered when evaluating the reasonableness of a search." *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 603 (7th Cir. 2011) (citing *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)). Generally, the rule provides that law-enforcement officers must both knock and

announce their presence—communicating their identity as law-enforcement officers and their purpose or authority—before entering someone's residence. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1082–83 (7th Cir. 2005) (citations omitted). Under certain exigent circumstances, however, it is not necessary to knock and announce. Knocking and announcing is not required where law enforcement has a reasonable suspicion that: (1) the circumstances present a threat of physical violence; (2) evidence would likely be destroyed if advance notice were given; or (3) knocking and announcing would be futile. *See Hudson v. Michigan*, 547 U.S. 586, 589–90 (2006) (citing *Wilson*, 514 U.S. at 936; *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)).[4]

The state-trooper defendants argue that exigent circumstances were present here—and thus a no-knock entry was permissible under the Fourth Amendment—because: Atkins's husband was suspected of having used a gun to commit a dangerous crime; the officers were searching for the gun in Atkins's house; and so there was a "threat of physical violence within the home." [45] at 7. But plaintiffs' complaint says nothing about what crime or crimes Atkins's husband was accused of committing on March 21, 2014, and the search warrant for plaintiffs' residence, which defendants attached to their motion to dismiss (and of which the court has

---

[4] Plaintiffs emphasize here that although the officers in this case obtained a warrant to search plaintiffs' home, the officers did not obtain a "no-knock" warrant. *See* [28] ¶¶ 24, 35. Where a warrant application reasonably suggests that the circumstances at hand are exigent in one or more of the ways just discussed, a judge or magistrate judge may issue a warrant authorizing a no-knock entry. *United States v. Banks*, 540 U.S. 31, 36 (2003). But even if the warrant makes no such authorization, the officers nonetheless may simply "go straight in" if the circumstances "support a reasonable suspicion of exigency." *Id.* at 36–37 (citing *Richards*, 520 U.S. at 394, 396, n. 7).

taken judicial notice), provides little in the way of additional facts. The warrant states only that someone was suspected of having committed the offenses of reckless discharge of a firearm, aggravated discharge of a firearm, and aggravated assault. *See* [33-1] at 2 (citing 720 ILCS 5/12-2(c)(3); 720 ILCS 5/24-1.2(a)(2); 720 ILCS 5/24-1.5(a)). The statutory definitions of these offenses do provide some clues (specifically, that the police may have suspected the husband of having fired a weapon from inside his car at someone else who was also riding in a car[5]), but what exactly the police knew or believed about the circumstances surrounding that incident—or about Atkins's husband more generally (*e.g.*, whether he had a history of committing similar or other offenses)—is not in the record. Indeed, the complaint is silent as to whether the officers even believed that the husband was in plaintiffs' house when they began to execute the search warrant for his gun. Absent a more developed factual record, it cannot be determined whether the officers reasonably suspected that alerting the plaintiffs to their presence would have endangered the officers' safety. Accordingly, it cannot yet be determined whether the officers violated the plaintiffs' clearly established rights by entering the plaintiffs' home unannounced.

---

[5] Under Illinois statutory law, reckless discharge of a firearm is defined as the discharging of a firearm "in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a). Aggravated discharge of a firearm is defined as the knowing or intentional discharge of a firearm "in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." *Id.* at 5/24-1.2(a)(2). Aggravated assault (based on the use of a firearm) is defined as, among other things, the discharge of a firearm from a motor vehicle when committing an assault. *See id.* at 5/12-2(c)(3).

Nor can it yet be resolved whether the officers violated the plaintiffs' clearly established rights *after* the officers entered the house. The trooper defendants again argue that the force used by the officers once inside the house—*i.e.*, pointing their weapons at the plaintiffs—was reasonable. This use of force was justified, say defendants, because, the officers still feared that their safety was at risk. *See* [33] at 8. When executing a search warrant, the police "may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles Cnty., Cal. v. Rettele*, 550 U.S. 609, 614 (2007). Officers may need a moment, for example, to secure the room and to make sure that the persons present are not dangerous, or that other possibly-dangerous persons are not close by. *See id.* at 615. But any such precautionary actions must be reasonable and proportionate to the circumstances at hand, and it may in some cases be *un*reasonable to use a gun to detain individuals while carrying out a search. *See, e.g., Baird v. Renbarger*, 576 F.3d 340, 344–47 (7th Cir. 2009).

Too little is known about the circumstances in this case to determine if, by pointing their weapons at the plaintiffs, the officers violated the plaintiffs' clearly established rights. Even if, when first entering the plaintiffs' bedroom, it was reasonable for the officers to point their weapons at Atkins and her daughter, it does not necessarily follow that any continued gun-pointing was appropriate. *See id.* at 345 ("[G]un pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." (citing *Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992));

*id.* at 346 ("[P]olice are not entitled to point their guns at citizens when there is no hint of danger . . . .").

Defendants' motion to dismiss Count I based on qualified immunity is therefore denied.

### 2. *Substantive Due Process (Count III)*

The state-trooper defendants next argue that qualified immunity bars plaintiffs' due-process claim (Count III). In their amended complaint, plaintiffs allege that the officers violated Atkins's due-process right to familial integrity by removing her minor daughter, Jane Doe, from Atkins's custody and control on the morning of March 26, 2014, and by denying Atkins access to both of her children while she was detained in police custody for more than 12 hours that same day. *See* [28] ¶¶ 29, 45.

I do not determine whether qualified immunity precludes Atkins's substantive due-process claim because this claim cannot proceed for another reason. Atkins claims that the officers interfered with her parental rights, but she contends that what caused this interference was her arrest and corresponding detention in jail—in other words, her seizure by the police. Because Atkins's due-process claim is premised on her seizure, which is governed by the Fourth Amendment (as Atkins correctly notes in her false-arrest claim in Count II, *see* [28] ¶ 42), the due-process claim cannot continue. *See Brokaw*, 235 F.3d at 1017–18 ("[S]ubstantive due process should not be called upon when a specific constitutional provision protects the right allegedly infringed upon." (citing *United States v. Lanier*, 520 U.S. 259, 272 n. 7

(1997))); *see also Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011) (citing *Doe v. Heck*, 327 F.3d 492, 518 n. 23 (7th Cir. 2003); *Brokaw*, 235 F.3d at 1017–18). Atkins's objective in bringing her due-process claim is to obtain damages stemming from her seizure by law enforcement. Such a claim is governed by the Fourth Amendment, not the Fourteenth. *See Heck*, 327 F.3d at 518 n. 23.

Defendants' motion to dismiss Count III of the amended complaint is therefore granted as to all forms of liability (individual, supervisory, and conspiracy).

## C.     Sovereign Immunity (State-Law Claims)

The state-trooper defendants assert that plaintiffs' state-law claims—assault (Count IV), intentional infliction of emotional distress (Count VI), and false imprisonment (Count VIII)—are barred by state sovereign immunity. More specifically, defendants argue that the district court does not have subject-matter jurisdiction over these claims because, under Illinois law, plaintiffs' state-law claims must be brought in the Illinois Court of Claims. *See* [33] at 4, 11–13.

The Eleventh Amendment protects states and their agencies from suit in federal court unless the State consents to suit or Congress has otherwise abrogated the State's immunity. *Tucker v. Williams*, 682 F.3d 654, 658 (7th Cir. 2012) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Davidson v. Bd. of Govs.*, 920 F.2d 441, 442 (7th Cir. 1990)). Illinois abolished its sovereign-immunity doctrine through the 1970 Constitution, "[e]xcept as the General Assembly may provide by law." *Loman v. Freeman*, 229 Ill.2d 104, 112 (2008) (quoting Ill. Const. 1970, art. XIII,

§ 4). The General Assembly, in turn, reinstituted the doctrine by enacting the State Lawsuit Immunity Act, 745 ILCS 5/0.01 *et seq.*, which provides that the State "shall not be made a defendant or party in any court" except as set forth in the Court of Claims Act (and two other state statutes not relevant here), *id.* at 5/1. The latter Act establishes the Illinois Court of Claims as having exclusive jurisdiction over, among other things, all claims against the State for damages "in cases sounding in tort." *Loman*, 229 Ill.2d at 112 (quoting 705 ILCS 505/8(d)).

Illinois employs a multi-part test to determine whether a claim is against the State for purposes of the Court of Claims Act. *See, e.g.*, *Jinkins v. Lee*, 209 Ill.2d 320, 330 (2004) (explaining that, in Illinois, an action is considered to be against the State where: (1) there are no allegations that an agent or employee of the State acted "beyond the scope of his authority"; (2) the duty allegedly breached was not a duty owed to the public generally, independent of state employment; and (3) the actions at issue involve matters "ordinarily within [the] employee's normal and official functions of the State" (quoting *Healy v. Vaupel*, 133 Ill.2d 295, 309 (1990))). In the past, the Illinois test has been applied to state-law claims in federal court to determine whether the federal court has subject-matter jurisdiction over those claims. *See, e.g.*, *Turpin v. Koropchak*, 567 F.3d 880, 882–84 (7th Cir. 2009); *Richman v. Sheahan*, 270 F.3d 430, 441–42 (7th Cir. 2001). More recently, however, the Seventh Circuit has held that "a state employee's sovereign-immunity defense does not impact a federal court's jurisdiction over a case." *Fields v. Wharrie*, 672 F.3d 505, 518 (7th Cir. 2012) (citing *Rodriguez v. Cook Cnty., Ill.*, 664 F.3d 627,

630–32 (7th Cir. 2011)); *cf. Woods v. Cook Cnty., Illinois*, No. 13 C 2607, 2014 WL 340422, at *3–4 (N.D. Ill. Jan. 30, 2014) (noting the shift in approach).

As explained in *Rodriguez*, "states cannot insist that any particular category of litigation be conducted . . . in state court" apart from invoking their rights under the Eleventh Amendment. 664 F.3d at 632 (citation omitted). The Eleventh Amendment does not reach individual- or personal-capacity claims. *See id.* Plaintiffs' claims here for assault, intentional infliction of emotional distress, and false imprisonment are most appropriately considered personal-capacity claims because their stated purpose is to obtain money damages from individual defendants, *see* [28] at 18, 23, 27. *See Rodriguez*, 664 F.3d at 631. Accordingly, the district court may exercise supplemental jurisdiction over these claims under 28 U.S.C. § 1367(a). Defendants' motion to dismiss the state-law claims for lack of jurisdiction is denied.[6]

### D.    Claims for Assault and Emotional Distress (Counts IV, VI)

The state-trooper defendants argue that, in any event, the claims for assault (Count IV) and intentional infliction of emotional distress (Count VI) should be

---

[6] The parties did not address *Rodriguez* or *Fields* (cases that involved prosecutorial immunity in addition to state-law sovereign immunity), and there may be some tension between those cases and the Seventh Circuit's other decisions interpreting the State Lawsuit Immunity Act as a jurisdictional bar in federal court. Applying *Rodriguez* and *Fields* to this case makes sense, however, because whether the Eleventh Amendment prohibits a federal court from hearing a case should not depend on a state-law statutory defense. Principles of federal law determine whether the amendment applies. Here, the state-law causes of action are claims against the individual defendants in their individual capacities (as the individual-versus-official-capacity distinction is understood in the Eleventh Amendment context), and therefore a federal court can have jurisdiction.

dismissed under Rule 12(b)(6) because these claims fail to state a proper claim for relief.

The assault claim necessarily fails, say defendants, because the officers' use of force in this case was reasonable and justified, and in Illinois a justifiable use of force is an affirmative defense to an assault or battery claim. *See* [33] at 13–14 (citing *People v. Sambo*, 554 N.E.2d 1080, 1085 (Ill. App. Ct. 1990)). Even if defendants are correct that a justifiable use of force is a proper defense to assault, it would not be appropriate to dismiss plaintiffs' assault claim on that ground. In general, plaintiffs need not anticipate and overcome in their complaints any affirmative defenses. *See Levin v. Miller*, 763 F.3d 667, 671 (7th Cir. 2014) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). And although a claim may in theory be dismissed if an affirmative defense "is so plain from the face of the complaint that the suit can be regarded as frivolous," *Walker v. Thompson*, 288 F.3d 1005, 1009–10 (7th Cir. 2002) (citations omitted), this is not such a case. As previously discussed, it is not sufficiently clear from the facts alleged in the complaint—or from the facts apparent in the search warrant—that defendants' use of force *was* reasonable under the circumstances presented here. Thus, to the extent defendants seek to dismiss the assault claim based on a justifiable-force defense, the motion is denied.

For similar reasons, the motion is also denied insofar as defendants seek to dismiss the claim for intentional infliction of emotional distress. To prove such a claim in Illinois, a plaintiff must show: (1) that the defendants' conduct was "extreme and outrageous"; (2) that the defendants intended their conduct to inflict

severe emotional distress (or at least knew that there was a high probability that their conduct would do so); and (3) that the plaintiff did in fact suffer severe emotional distress as a result of that conduct. *Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (citing *McGrath v. Fahey*, 126 Ill.2d 78 (1988)). The trooper defendants argue that the facts as plaintiffs have pleaded them show, first, that defendants' conduct was not extreme and outrageous, and second, that plaintiffs' distress was in any event not severe. *See* [33] at 14–15.

As to the extent of plaintiffs' emotional distress, plaintiffs have alleged that it was severe, *see* [28] ¶ 63, and that is all that is necessary at this stage. Whether their distress was actually severe is a fact-intensive inquiry that cannot be resolved at this point in the case. As for whether the troopers' conduct was extreme and outrageous under Illinois law, this, too, is an issue that ought to be decided on a more developed factual record. Conduct is extreme and outrageous under Illinois law when it goes "beyond all bounds of decency and [is] considered intolerable in a civilized community." *Lopez*, 464 F.3d at 720 (citation omitted). Defendants argue that all they did was temporarily point their guns at plaintiffs, temporarily detain Atkins, and thus temporarily remove Atkins's daughter from her care—and that this conduct cannot possibly be considered indecent or intolerable. *See* [33] at 15. But this description, while not inconsistent with the events alleged in the complaint, glosses over the circumstances in which those events supposedly took place. Plaintiffs contend that the officers terrorized Atkins to coerce her cooperation in the officers' investigation of her husband. If a jury were persuaded that these

allegations are true, it might also conclude that the officers' actions would not be tolerable in civilized community. Plaintiffs have alleged enough in support of their emotional-distress claim to survive a motion to dismiss.

## IV.    Conclusion

For the reasons discussed above, the state-trooper defendants' motion to dismiss the claims against them, [33], is granted in part and denied in part. Counts I, II, and VIII of the amended complaint are dismissed to the extent those claims: (1) are brought against the state-trooper defendants; and (2) assert a claim for individual or supervisory liability. Count VI (which is asserted against only the trooper defendants) is dismissed to the extent that claim alleges individual liability. These claims are dismissed without prejudice. Count III of the complaint is dismissed in its entirety, with prejudice. Defendants' motion to dismiss the remaining claims against the troopers is denied.

ENTER:

Manish S. Shah
United States District Judge

Date:  6/22/15